# APRIL TERM, 1868, AT DETROIT.

## The People v. Robert Garbutt.

*Homicide: Evidence of disposition.* On a trial for homicide, when there was no pretence that defendant had committed the offense in self defense, but on the contrary had deliberately done the deed, evidence showing the quarrelsome disposition of deceased, that he carried weapons, and had threatened to use them on defendant, was held clearly inadmissible.

*Reputation as to being a good sol lier.* On the trial, evidence was offered tending to show that while defendant was in the army he was reported a good and valiant soldier: held irrelevant.

*Mental condition as shown by undue excitement in time of battle.* The opinions of witnesses as to what is undue and unnatural excitement in time of battle, can not generally afford safe ground for conclusions as to the person's mental condition years afterward, unless it appears that the excitement completely mastered the intellect, and deprived the person of accountability.

*Hereditary insanity: Evidence.* In criminal cases, it is competent to show hereditary tendency to insanity on the part of a defendant. *Held further*, that evidence of mental unsoundness on the part of a brother or sister of the person whose competency is in question, is admissible; and the jury should be allowed to consider it in connection with all the other evidence bearing upon that subject.

*Drunkenness, no defense in commission of crime.* Voluntary drunkenness, of whatever degree, constitutes no defense to the commission of crime.

*Criminal cases: Insanity: Burden of proof.* Sanity being the normal condition of the mind, the prosecution in a criminal trial may rest upon the presumption that the accused was sane when he committed the act, until it is overcome by the defendant's evidence.

But when any evidence is given which tends to overthrow that presumption, the jury are to examine, weigh, and pass upon it with the understanding that, although the initiative in presenting the evidence is taken by the defense, the burden of proof upon this part of the case, as well as upon the other, is upon the prosecution to establish the conditions of guilt.

17 Mich.—B.

THE PEOPLE v. GARBUTT.

*Charge of court in criminal cases: Rights of defendant to further charges.* After the court had charged the jury, the defendant's counsel requested a further charge that as to good character it is for the jury to consider whether such reputation tends to rebut the presumption of malice. The court refused to give the charge, on the ground that it might tend to mislead the jury, without further explanation, which the court did not feel bound then to give, in view of a rule adopted by the court requiring that requests to charge must be handed in by counsel before the argument was commenced.

    *Held*, that, though the rule was reasonable, and one which in courtesy counsel should certainly comply with, yet no unbending rule to this effect can be laid down, especially as the necessity for requests to charge may often arise from the very charge given by the judge.

*Good character.* In every criminal trial, good character is a fact which the defendant is at liberty to put in evidence; and, being in, the jury have a right to give it such weight as they think it entitled to.

*Heard April 21st and 22d. Decided April 28th.*

Defendant was tried and convicted in the Recorder's Court at Detroit, upon an information for murder.

The facts are stated in the opinion.

*Wm. L. Stoughton,* Attorney General, for the People.

The defendant was convicted in the Recorder's Court of the city of Detroit, of the crime of murder in the first degree. The fact of the homicide is not denied. The questions raised by the bill of exceptions relate to the admission of evidence and the charge of the court.

1. The counsel for the defendant requested the court to charge the jury " that malice is a necessary element in the commission of murder, and must be proved by the prosecution as part of this case."

The court gave the charge as requested; adding the words " either by inference from other facts proved in the case, or by direct proof from declarations and acts of the defendant."

This qualification was necessary and proper. Malice is sometimes a mere inference of law from the facts proved. *1 Bish. C. L.* § *263; 1 Whart. Am. C. L. 944; 11 Humph. 172; 1 Ashm. 289; 5 Blackf. 299; 1 East P. C. 371; 1 Hill, 377; 5 Cush. 535; 5 Mich. 1; 10 Id. 218.*

2. The court also instructed the jury "that the law so far regarded human infirmity that if a man under the influence of passion, excited by reasonable provocation, should lose all self-control and kill another, the presumption of malice would be repelled, and the offense would be manslaughter.

That what is such reasonable provocation is a question of law for the court, and in this case the fact that La Plante succeeded in inducing Miss Boucher to give up the defendant and marry him, was not such reasonable provocation as will reduce the killing of La Plante from murder to manslaughter."

The court did not charge that there was no reasonable provocation in this case. As a legal proposition the instruction was clearly correct. There is a large number of cases where the courts have declared that certain alleged facts do not constitute reasonable provocation.— *1 Whart. Am. C. L. 970–986, and cases there cited; 3 Greenl. Ev. § 125; 2 Ld. Raymond, 1493; 8 C. and P. 182; 10 Mich. 212.*

3. The counsel for the defendant, after the jury had been charged, also requested a further charge to the jury, "that as to good reputation it is for the jury to consider whether such reputation tends to rebut the presumption of malice."

The court refused to give the charge, on the ground that it might mislead the jury, without further explanation, which the court did not feel bound then to give.

The charge requested was broad and unqualified, and would necessarily tend to mislead the jury.— *1 Whart. Am. C. L. 643–646; 5 Cush. 535.*

4. The rulings of the court in refusing to admit certain evidence offered by the defendant were correct.

*a.* The evidence offered by the defendant to show that the reputation of La Plante, the deceased, was that of a quarrelsome man, was clearly inadmissible. — *Am. C. L. 641; 2 Gray, 294; 16 Ill. 17; 17 Mo. 544.*

*b.* The evidence of the temporary insanity of the defendant's brother while in the army was too remote. It did not tend to prove hereditary insanity.— *6 Jones, N. C. 471.*

*c.* Evidence of the defendant's being a valiant soldier was inadmissible. It had no reference or analogy to the nature of the crime with which he was charged.— *1 Bish. Cr. Pro. 489; 3 Greenl. Ev. § 25; 6 Mo. 12; 2 Wend. 352.*

And evidence of his undue excitement during engagements in battle was liable to a like objection.— *7 C. and P. 673; 2 Mass. 307; 10 Ga. 101.*

It is well settled that voluntary intoxication of whatever degree furnishes no excuse for a crime committed under its influence.— *1 Bish. Cr. L. § 298; 1 Am. C. L. § 37; 2 Barb. 566; 2 Gray, 463; 2 Park. C. R. 223; Russ. & Ry. 166; 9 Humph. 663; 11 Id. 154.*

Sanity is presumed to be the normal state of the human mind, and it is never incumbent upon the prosecution to give affirmative evidence that such a state exists in a particular case.

The preponderance of authority is, that if the defense be insanity, it must be substantially proved as an independent fact, and that the burden is on the defendant to prove it.— *Am. C. L. §§ 55 and 71; Bish. Cr. Pro. §§ 533, 534 and notes; 2 Ala. 43; 21 Mo. 464; 6 Jones N. C. 366; 1 Zabriskie, 202; 3 C. & K. 188.*

*S. Larned,* for defendant.

1. It is for the court to define the legal import of the term malice aforethought; but whether it existed or not in any particular instance is a question of fact for the jury to determine. And the court has no right to withdraw the question of malice from the jury by assuming to draw the proper inferences from the whole or any part of the facts proved as presumptions of law.— *10 Mich. 218.*

The burden of proof as to malice rests with the prosecution, for the reason that malice is one of the essential ingredients of the crime of murder.— *Ibid.*

2. The court erred in excluding evidence of deceased's reputation, as to being a quarrelsome man, and as to carryrying arms and threatening to use them, and that he had threatened defendant. It bears directly upon the *bona fides* of the defendant's conduct, the state of his mind, and the question of malice ; and therefore admissible.

3. The court erred in charging that reasonable provocation was a question of law for the court, and that there was no reasonable provocation in this case.

It is, doubtless, in one sense the province of the court to define what in law will constitute a reasonable or adequate provocation; but not, in ordinary cases, to determine whether the provocation in the particular case is sufficient or reasonable. This is essentially a question of fact, and to be decided with reference to the peculiar facts of each particular case.— *10 Mich. 221, 222.*

The court must to some extent assume to decide upon the sufficiency of the alleged provocation when the question arises upon the admission of testimony; but after he has admitted the testimony he can not take the question away from the jury and decide it himself.

4. Intoxication to such an extent as to make the prisoner unconscious of what he was doing at the time of the commission of the offense negatives the existence of malice; and upon principle the defendant can not be held morally responsible for any other act than that of getting intoxicated; at any rate the offense becomes manslaughter, and not murder.

5. Whenever it appears from the evidence that at the time of doing the act charged, the prisoner was not of sound mind, but affected with insanity; and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted.— *31 Ill. 385.*

When insanity is set up as an excuse for the act the defendant does not thereby assume the burthen of proof

upon that question. Sanity is a necessary condition to constitute the crime, and proof thereof, a part of the case to be made by the prosecution.— *16 N. Y. 58 ; 31 Ill. 385.*

It is competent for a defendant charged with crime to show the existence of hereditary insanity in his ancestors. He may also show that his brothers or sisters have been insane.

6. Upon the trial of a party for murder, evidence of his uniform good character as a man and a citizen is admissible, and there is no good reason why his character as a soldier, while engaged in the service of his country, should be excluded.

7. The court erred in refusing to admit testimony of any undue and unnatural excitement about the defendant during engagements in the army.

This evidence would tend to show the condition of his mind and memory, and was therefore admissible.

8. The court erred in refusing to charge as requested by defendant that as to good reputation it is for the jury to consider whether such reputation tends to rebut the presumption of malice.

COOLEY CH. J.

The defendant was convicted in the Recorder's Court of the city of Detroit, on an information charging him with the murder of one La Plante. On the trial, it was shown that La Plante, and a young woman named Emily Boucher, were coming down Woodward Avenue together, on the afternoon of September 21, 1867, when they were overtaken by the defendant, who, after a few words, fired a pistol at La Plante, wounding him mortally. No question was made that La Plante died of this wound, but it was insisted, on behalf of defendant, that it was inflicted by him under circumstances of great provocation, sufficient to reduce the offense from murder to manslaughter; and it was further claimed that he was at the time mentally incompetent of a

criminal intent; the reason being temporarily overthrown through the combined influence of intoxicating drinks, the great provocation, and perhaps of hereditary tendencies also.

The defendant's statement went to show that he was engaged to be married to Emily Boucher—the first day of May, 1868, being fixed upon for the ceremony; that he visited her twice a week, and had spent the evening of Tuesday, September 18th, with her as usual, but was informed by his mother on the next day of rumors that Emily was to be married to La Plante; that these rumors received confirmation from the statements of others, who added the circumstance that La Plante—who would appear to have been in better circumstances than the defendant— had deeded her forty acres of land; that defendant came to Detroit on the day of the homicide, saw La Plante and Emily get into a buggy together; followed them to a milliner's shop, where he succeeded in getting an interview with her, which he describes as follows:

"I said, 'I hear you are going to get married to La Plante?' She said, 'Yes.' I said 'Do you love him better than me?' She made no reply. I said, 'Do you love him or his property?' She said nothing. I went closer to her, put my arm around her and kissed her, and said, 'Emma, are you going to do as you promised?' She answered, 'Come up in the morning and I will tell you.' She made no resistance when I kissed her, but said, 'You must be careful.' We parted, and she got into a buggy; we got to the house, No. 58 Dubois street: from there I don't know where I went." Other evidence showed that he went immediately for the pistol with which the fatal wound was inflicted, but it tended to corroborate the statement of the prisoner as to his engagement, and there was also evidence tending to show that he was at this time considerably under the influence of liquor.

The first exception that appears in the record, was taken to the ruling of the Recorder, excluding evidence offered by

the defense to show that La Plante was reputed to be a quarrelsome man, who carried weapons and threatened to use them, and had threatened the defendant. This ruling was correct beyond question. There was no pretence that defendant had killed La Plante in self defense; but on the contrary, he had followed him for the apparent purpose of inflicting the mortal wound. La Plante's reputation or threats could have no possible relevancy to the case.

Exception was also taken to the exclusion, by the Recorder, of evidence offered to show that the defendant, while in the army from 1862 to 1865, was reputed a good and valiant soldier; but there is quite as little question of the correctness of this ruling. It is somewhat difficult to suggest any plausible reason in favor of the admission of such evidence, and it was clearly irrelevant.

As bearing upon the question of insanity, a witness for the defense, who had been in the army with defendant, was asked to state whether he saw, during any engagements, any undue and unnatural excitement about the defendant. This question was objected to, and excluded by the Recorder, and we think correctly. The opinions of witnesses as to what is undue and unnatural excitement in time of battle, can not generally afford ground for safe conclusions as to a person's mental condition years afterwards, unless it appears that the excitement actually mastered the intellect, and deprived the person of accountability, which we do not understand was pretended here.

The most important questions arise upon the exclusion, by the Recorder, of evidence offered to show the insanity of a brother of the prisoner, and upon his charge to the jury, and refusals to charge as requested on behalf of defendant.

Those questions which relate to the discovery and proof of insanity in criminal cases, are perhaps the most difficult of any with which courts and juries are compelled to deal. Mental disease is itself so various in character, so vague, sometimes, in its manifestations, and so deceptive, especially

in its early stages, and its causes are so subtle and so difficult to trace, that the most experienced experts are sometimes obliged to confess that, however careful and thorough their investigations, they still prove unsatisfactory, leaving the mind not only in a condition of painful uncertainty upon the principal question whether mental disease actually exists, but when its actual presence is demonstrated, failing utterly, in many cases, to trace it to any sufficient cause. This fact is very forcibly brought home to us by the conflicting views expressed on criminal trials by careful, experienced and conscientious medical experts, who, regarding the same state of facts in the light of their scientific investigations and actual but diverse experience, are forced to express differing views, in consequence of which juries, in these difficult cases, are sometimes left in a state of greater doubt and difficulty, if possible, than if no such evidence had been given. The case of *Freeman v. People, 4 Denio, 9,* and the more recent and noted case of the forger *Huntingdon,* are conspicuous instances in illustration of this truth; but others will readily occur to the mind.

The defense sought to show hereditary tendency to insanity on the part of the defendant. That insane tendencies are transmitted from parent to child, there is now no longer a doubt; and though it was once ruled that proof that other members of the same family have decidedly been insane is not admissible either in civil or criminal cases (*McAdam v. Walker, 1 Dow. P. C. 148, 174; Chitty's Med. Juris. 354 – 5,*) yet this ruling has since been rejected as unphilosophical and unsound, and it is now allowed to prove the insanity of either parent, or even of a more remote ancestor, since it seems well established that insanity sometimes disappears in one generation and reappears again in the next (*Taylor's Med. Juris. 628 – 9, and cases cited; Whart. and Stille Med. Juris. 85 et seq.*).

In the case at bar it was not claimed that either parent, or any other ancestor, had been insane; but the defense

offered to show that insanity had been developed in a brother, arising from a cause similar to that which, it was alleged, had induced the destructive act of the defendant; and this fact was sought to be placed before the jury as throwing some light on the defendant's conduct and accountability.

Although this evidence could not be very satisfactory in character, we think it was legally admissible. It is now generally believed that other things besides actual mental disease in the parents may cause the transmission of taints to their offspring, which result in some cases in idiocy or insanity. The children of habitual drunkards are thought to be much more susceptible to mental disease than those of persons whose habits have been correct and regular, and the medical opinion has been expressed that the children of those who are married late in life are also more subject to insanity, than those born under other circumstances ( *Taylor's Med. Juris. 629* ). But it sometimes occurs that persons in vigorous health and correct habits, who have nevertheless entered into a marriage which violates some physiological law, may become parents of weak and diseased children, only, so that insanity enters the family for the first time in the person of the children, but through qualities derived exclusively from the parentage. Melancholy examples of this fact are presented sometimes in cases of the intermarriage of near relatives. The reasons for this are not fully understood and can not be explained. We can only say of such cases, that observation teaches us the existence of a law of nature which can not be broken with impunity, but the full boundaries, extent and force of which we are as yet unable to fully comprehend, point out and explain. But there are other cases where we may be able to discover effects without the ability to point out either the law or the causes which produce them. What peculiar combinations of qualities in the parents may tend to produce mental perversion, weakness or disease

in children, must forever remain, in many cases, matter of profound mystery. If a family of several children should be found, without known cause, to be idiotic, or subject to mental delusions, the inference of hereditary transmission would, in many cases, be entirely conclusive, notwithstanding the inability to point out anything of a similar character in any ancestor. Insanity in a part of the children only would be less conclusive; but the admissibility of the evidence in these cases can not depend upon its quantity, and it could never be required that it should amount to a demonstration. In some cases its force must be small; in others it will prove hereditary taint with great directness. We think evidence of mental unsoundness on the part of a brother or sister of the person whose competency is in question, is admissible, and that the jury should be allowed to consider it in connection with all the other evidence bearing upon that subject.

The counsel for the defendant requested the court to charge the jury that if they believed the defendant was intoxicated to such an extent as to make him unconscious of what he was doing at the time of the commission of the offense, the defendant must be acquitted.

A doctrine like this would be a most alarming one to admit in the criminal jurisprudence of the country, and we think the Recorder was right in rejecting it. A man who voluntarily puts himself in condition to have no control of his actions, must be held to intend the consequences. The safety of the community requires this rule. Intoxication is so easily counterfeited, and when real it is so often resorted to as a means of nerving the person up to the commission of some desperate act, and is withal so inexcusable in itself, that the law has never recognized it as an excuse for crime.— *Commonwealth v. Hawkins, 3 Gray, 463; United States v. Drew, 5 Mason, 28; People v. Hammill, 2 Parker, 223; Pirtle v. State, 9 Humph. 663.* Whether all the charges given by the Recorder on this subject were correct, we do

not feel called upon to consider; as the only exception to
the charge as given was a general one to the whole charge,
which is not sufficient, when a part of it is correct, to raise
questions upon other parts.

The defendant's counsel also requested the court to
charge the jury that sanity is a necessary element in the
commission of crime, and must be proved by the prosecu-
tion as a part of their case whenever the defense is insan-
ity.    Also, that where the defense makes proof of insanity,
partial or otherwise, whenever it shall be made to appear
from the evidence that prior to or at the time of the offense
charged, the prisoner was not of sound mind, but was af-
flicted with insanity, and such affliction was the efficient
cause of the act, he ought to be acquitted by the jury.
These requests were refused.

It is not to be denied that the law applicable to cases of
homicide where insanity is set up as a defense, is left in a
great deal of confusion upon the authorities; but this, we
conceive, springs mainly from the fact that courts have some-
times treated the defense of insanity as if it were in the na-
ture of a special plea, by which the defendant confessed the
act charged, and undertook to avoid the consequences by
showing a substantive defense, which he was bound to make
out by clear proof. The burden of proof is held by such au-
thorities to shift from the prosecution to the defendant when
the alleged insanity comes in question; and while the defen-
dant is to be acquitted unless the act of killing is established
beyond reasonable doubt, yet when that fact is once made
out, he is to be found guilty of the criminal intent, unless
by his evidence he establishes with the like clearness, or at
least by a preponderance of testimony, that he was incapable
of criminal intent at the time the act was done. — *Regina v.
Taylor*, *4 Cox, C. C. 155; Regina v. Stokes, 3 C. & K. 188;
State v. Brinyea, 5 Ala. 244; State v. Spencer, 1 Zab. 202;
State v. Stark, 1 Strob. 479.*    These cases overlook or dis-
regard an important and necessary ingredient in the crime

of murder; and they strip the defendant of that presumption of innocence which the humanity of the law casts over him, and which attends him from the initiation of the proceedings until the verdict is rendered.   Thus, in *Regina v. Taylor*, *supra*, it is said: "In cases of insanity there is one cardinal rule never to be departed from, viz: that the burden of proving innocence rests on the party accused." And in *State v. Spencer*, *supra*, the rule is laid down thus: "Where it is admitted or clearly proved that the prisoner committed the act, but it is insisted that he was insane, and the evidence leaves the question of insanity in doubt, the jury ought to find against him.   The proof of insanity at the time of committing the act ought to be as clear and satisfactory, in order to acquit a prisoner on the ground of insanity, as proof of committing the act ought to be in order to find a sane man guilty."   These cases are not ambiguous, and, if sound, they more than justify the Recorder in his charge in the case before us.

The defendant was on trial for murder.   Murder is said to be committed when a person of sound mind and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied. — *3 Coke Inst. 47; 4 Bl. Com. 195; 2 Chit. Cr. L. 724.*   These are the ingredients of the offense; the unlawful killing, by a person of sound mind and with malice; or to state them more concisely, the killing with criminal intent; for there can be no criminal intent when the mental condition of the party accused is such that he is incapable of forming one.

These, then, are the facts that are to be established by the prosecution in every case where murder is alleged.   The killing alone does not in any case completely prove the offense, unless it was accompanied with such circumstances that malice in law or in fact is fairly to be implied.   The prosecution takes upon itself the burden of establishing not only the killing, but also the malicious intent in every

case. There is no such thing in the law as a separation of the ingredients of the offense, so as to leave a part to be established by the prosecution, while as to the rest the defendant takes upon himself the burden of proving a negative. The idea that the burden of proof shifts in these cases is unphilosophical, and at war with fundamental principles of criminal law. The presumption of innocence is a shield to the defendant throughout the proceedings, until the verdict of the jury establishes the fact that beyond a reasonable doubt he not only committed the act, but that he did so with malicious intent.

It does not follow, however, that the prosecution at the outset must give direct proof of an actual malicious intent on the part of the defendant; or enter upon the question of sanity before the defendant has controverted it. The most conclusive proof of malice will usually spring from the circumstances attending the killing, and the prosecution could not well be required in such cases to go further than to put those circumstances in evidence. And on the subject of sanity, that condition being the normal state of humanity, the prosecution are at liberty to rest upon the presumption that the accused was sane, until that presumption is overcome by the defendant's evidence. The presumption establishes, *prima facie*, this portion of the case on the part of the government. It stands in the place of the testimony of witnesses, liable to be overcome in the same way. Nevertheless it is a part of the case for the government; the fact which it supports must necessarily be established before any conviction can be had; and when the jury come to consider the whole case upon the evidence delivered to them, they must do so upon the basis that on each and every portion of it they are to be reasonably satisfied before they are at liberty to find the defendant guilty.

This question of the burden of proof as to criminal intent was considered by this court in the case of *Maher v. The People, 10 Mich. 212,* and a rule was there laid down

which is entirely satisfactory to us, and which we have no disposition to qualify in any manner. Applying that rule to the present case, we think that the Recorder did not err in refusing to charge that proof of sanity must be given by the prosecution as. a part of their case. They are at liberty to rest upon the presumption of sanity until proof of the contrary condition is given by the defense. But when any evidence is given which tends to overthrow that presumption, the jury are to examine, weigh and pass upon it with the understanding that although the initiative in presenting the evidence is taken by the defense, the burden of proof upon this part of the case, as well as upon the other, is upon the prosecution to establish the conditions of guilt. Upon this point the case of *People v. McCann, 16 N. Y. 58,* is clear and satisfactory, and the cases of *Commonwealth v. Kimball, 24 Pick. 373; Commonwealth v. Dana, 2 Met. 340; State v. Marler, 2 Ala. 43; Commonwealth v. McKie, 1 Gray, 61; Commonwealth v. Rogers, 7 Metc. 500,* and *Hopps v. People, 31 Ill. 385,* may be referred to in further illustration of the principle. See also *Doty v. State, 7 Blackf. 427.* The recent case of *Walter v. People, 32 N. Y. 147,* does not overrule the case of *People v. McCann,* but, so far as it goes, is entirely in harmony with the views here expressed.

But it is claimed the Recorder erred when he declined to charge that, if it appeared from the evidence that defendant was afflicted with insanity, and such affliction was the efficient cause of the act, he ought to be acquitted by the jury. This refusal, however, must be considered in connection with the charge actually given, and we are not satisfied that other portions of the charge do not fully cover this ground. Were this the sole error charged, it might be necessary to examine all the instructions to the jury with some care, to see if, taken as a whole, they could tend to mislead. As, however, a new trial must be ordered on other grounds, it does not become important to make any such

critical examination. If we do not misapprehend the charge, the view of the Recorder seems to have been substantially the same as our own.

The case was argued before us by the defense, on the assumption that, in one part of his charge to the jury, the Recorder had laid down a rule on the subject of provocation differing from that in *Maher v. People*; but we do not discover any thing in the exceptions upon which the argument can be fairly based, and shall not, therefore, undertake to determine whether the charge is objectionable in the particular referred to.

The only remaining error alleged, relates to the refusal of the Recorder to charge, as requested, upon the evidence adduced by the defendant to establish his uniform good character previous to the time of the alleged offense. To understand this refusal, it must be known that the counsel for the defendant had previously been informed by the court that any requests to charge the jury should be handed in before the commencement of his argument to the jury. In compliance with this direction, seven written requests were handed in, which were appropriately responded to. None of these related to good character. The court, however, in his charge, alluded to the proof of good character, coupling it with a caution to the jury not to give too much weight to the statement the prisoner had made in the case, and which must be considered as made under strong temptations to state that which was untrue in his own exculpation. After this charge was given, the court was asked to instruct the jury that they had a right to believe the defendant's statement in opposition to sworn evidence; and this charge was given with a repetition of the caution above stated. The court was then further requested to charge that, as to good reputation, it is for the jury to consider whether such reputation tends to rebut the presumption of malice. The court refused to give the charge, on the ground that it might mislead the jury, without further explanation, which the court did not feel bound then to give.

THE PEOPLE *v.* GARBUTT.

We infer, from the bill of exceptions, that the Recorder declined to give what he regarded as proper instructions on this point, because the request was not handed in at a prior stage of the case. · As a legal proposition, however, the refusal could hardly be justified on this ground. It is undoubtedly proper that requests to charge should be handed in before counsel go to the jury upon the facts; and a rule by the court to this effect ought to be regarded as binding by counsel. Fairness · to the judge, and common courtesy would require that such a rule be complied with, that he may have opportunity to carefully weigh his instructions, and to reduce them to writing, if he shall so desire. Counsel who should decline to obey so reasonable a request, might justly be regarded as wanting in that courtesy which distinguishes the members of the profession generally in their intercourse with each other, and which is especially due from the bar to the judges who endeavor patiently to administer the law with impartiality amid all the difficulties and embarrassments that sometimes surround the trials by jury. Nevertheless, the rule can not be laid down as an unbending rule of law. The necessity for a request to charge will sometimes arise from what has already been charged by the judge. It may become important in order to render more clear and explicit that which he has already stated, but which has fallen short of a complete exposition of the law upon the point to which his remarks have been addressed. And if, in any case, the counsel should fail to request the court to lay down those familiar rules of law which it is always to be expected will be given in the cases to which they are applicable — such as the necessity of malice in murder, or a breaking in burglary — the defense could not justly be precluded by such omission from having the proper instructions given.

It is quite possible that in the present case counsel took it for granted that the proper instructions would be given on the subject of the evidence of character, without any

17 MICH. — c.

request to that effect. With many judges it is a matter of course to give such instructions, and it is to be presumed the Recorder would have done so in the present case had it occurred to him as important. But we think the request of counsel did not come too late in this instance, and he was entitled to have the proper instructions given.

We also think the instructions requested were correct in substance, and that the defendant was entitled to them without explanation or qualification. The whole request was that the jury be instructed that they had a right to consider whether the evidence of good character tended to rebut the presumption of malice. That the evidence was admissible in the case was unquestionable, but it was equally unquestionable that it could have no bearing whatever except upon the question of malicious intent. To refuse the instruction, therefore, seems to us equivalent to holding, or at least to leaving the jury to infer, that the evidence which was lawfully put into the case, was immaterial after it was in.

 The instruction is often given in these cases, that proof of good character is not to be allowed to weigh against evidence, which in itself is satisfactory; and Mr. Starkie has said it ought never to have any weight except in a doubtful case. — *1 Stark. Ev. 75.* Such instructions are well calculated to mislead. Good character is an important fact with every man; and never more so than when he is put on trial charged with an offense which is rendered improbable in the last degree by a uniform course of life wholly inconsistent with any such crime. There are cases where it becomes a man's sole dependence, and yet may prove sufficient to outweigh evidence of the most positive character. The most clear and convincing cases are sometimes satisfactorily rebutted by it, and a life of unblemished integrity becomes a complete shield of protection against the most skillful web of suspicion and falsehood which conspirators have been able to weave. Good character may not

only raise a doubt of guilt which would not otherwise exist, but it may bring conviction of innocence. In every criminal trial it is a fact which the defendant is at liberty to put in evidence; and being in, the jury have a right to give it such weight as they think it entitled to. Chief Justice *Shaw* has pointed out in the Webster case how important it is in the case of some minor offenses, and he adds that, "even with regard to the higher crimes, testimony of good character, though of less avail, is competent evidence to the jury, and a species of evidence which the accused has a right to offer. But it behooves one charged with an atrocious crime, like this of murder, to prove a high character, and, by strong evidence, to make it counterbalance a strong amount of proof on the part of the prosecution."— *Commonwealth v. Webster, 5 Cush. 295.* In some cases, it may have even this great effect.

The difficulty at this point lies in attempting to surround the jury with arbitrary rules as to the weight they shall allow to evidence which has properly been placed before them. This court has several times found it necessary to declare that no such arbitrary rules are admissible. We refer particularly to the cases of *People v. Jenness, 5 Mich. 305; Maher v. People, 10 Id. 212,* and *Durant v. People, 13 Id. 351.* The trial of criminal cases is by a jury of the country, and not by the court. The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be. This is the theory of the law; and as applied to criminal accusations, it is eminently wise, and favorable alike to liberty and to justice. But to give it full effect, the jury must be

left to weigh the evidence, and to examine the alleged motives by their own tests. They can not properly be furnished for this purpose with balances which leave them no discretion, but which, under certain circumstances, will compel them to find a malicious intent when they can not conscientiously say they believe such an intent to exist.

Upon a full consideration of this case, we are compelled to say we find some errors in the record, for which the conviction should be set aside and a new trial awarded.

CAMPBELL and GRAVES JJ. concurred.

CHRISTIANCY J. did not sit.