## PEOPLE OF THE TERRITORY OF UTAH, RESPONDENT, v. GEORGE W. HANCOCK, APPELLANT.

CRIMINAL LAW.—HOMICIDE.—MURDER.—EVIDENCE.—On the trial of an indictment for murder where evidence has been admitted of the fact that a long time before the homicide the deceased had been castrated, but the evidence in no way tends to connect the defendant with the act of castration, such evidence having been admitted on the theory of showing malice on the part of the defendant, and not having been withdrawn from the consideration of the jury: *Held*, that this was error.

ID.—ID.—ID.—GOOD CHARACTER.—On the trial of an indictment for murder where the testimony as to the fact of killing is direct and the defendant has proven good character, it is error for the court to instruct the jury that proof of the good character of the person charged with the offense is always allowed in this class of cases and the weight to be given to it is to be determined by the jury. It is of importance in doubtful cases. When the evidence outside of the presumption of good character is clear and explicit, on which no doubt can be cast, good character will only cause the jury to hesitate and think about the matter; although later in the charge the jury are told that the character of the defendant is to be considered by them in weighing all the testimony in the case, and if his character, notwithstanding all the evidence, raises a reasonable doubt in their minds as to his guilt or innocence, he is to have the benefit of it.

ID.—ID.—ID.—BIASED CHARGE.—An instruction in connection with a charge to the jury on the subject of good character which states that the jury should always remember that a man has to commit his first crime; he cannot commit all the crimes, if he does commit any, at once; he has to break over the rules of good conduct and good life for the first time some time in his life, is error, because the jury may have understood that a man was expected to commit his first offense and that the crime of which the defendant stood charged was one that

he might be expected to commit as his first offense and might therefore be guilty of it.

ID.—ID.—ID.—LAPSE OF TIME.—Where the court charged the jury in regard to an alleged murder that had happened thirty-two years before indictment, that the length of time since the murder that is charged was committed and the beginning of the prosecution was not to be considered, and that time does not run either in favor or against the murderer and cannot wash away the stains left by the blood that the murderer has shed: *Held*, that the charge was erroneous as having a tendency to mislead the jury, and that from it they might infer the court's opinion as to the identity of the murderer, the degree of the offense, and the guilt of the defendant, and also because the lapse of time would be a strong consideration in testing the memory of the witnesses.

APPEAL from an order refusing a new trial and from a judgment of conviction of the district court of the first district.

The evidence was exceedingly voluminous and conflicting. The fact of Hancock's doing the killing was testified to by an eye-witness, who was strongly contradicted by other eye-witnesses. The charge of the court is as follows. After defining murder in the two degrees, manslaughter, voluntary, and involuntary, the court said:

"In all criminal prosecutions, and especially one of the grave charge that is made here, I instruct you that the presumption of innocence is to be borne in mind by you all the time from the beginning to the end of the case. A man charged with crime is presumed by the law to be innocent, and that you are not to forget, in determining this case, from the beginning to the end. The burden of not showing that he is innocent is not shifted at all; the burden is all the time upon the prosecution to show that he is guilty and guilty beyond a reasonable doubt. In the benevolence of our law this element is always an important one to be considered by the jury, and they are to remember it all the time. The burden of showing

guilt or innocence is never shifted to the defendant, and in order to find the defendant guilty you must believe, beyond a reasonable doubt, from the evidence that he is guilty of the crime as charged." Then followed a charge as to reasonable doubt and as to one aiding and abetting a crime. Then the court said: "The killing of Mrs. Jones is to be considered by you only in one respect. If you believe from the evidence, beyond a reasonable doubt, that the defendant killed Mrs. Jones, that is not to be considered by you in determining the question as to his guilt or innocence in regard to the killing of Henry Jones; but if you believe, beyond a reasonable doubt, that in the pursuit of Henry Jones the defendant went to the house where Mrs. Jones was, and in order to make her tell him where her son was and to aid him to make her give him information that would aid him in the pursuit of Jones, and on her refusal, he took her life, you are to consider that question as determining his motive in pursuing Jones and as affecting his purpose to take the life of Jones." Then followed a charge as to the justification for killing Jones, arising from the accusation of horse-stealing, and a charge upon the jury being the sole judges of the facts, etc., then the charge upon good character quoted in the opinion, then a charge upon a killing under arrest, then the charge as to length of time quoted in the opinion. Then followed other parts of the charge not necessary to be noticed, except the additional charge upon good character quoted in the opinion. In regard to the lapse of time the defendant requested the following: "If the jury find that at the time of the alleged killing, nearly thirty-two years ago, there were present a large number of witnesses by whose testimony the truth of the facts relative to the killing could have been established, and who were known to the prosecuting officers, or could have been known by slight

inquiry, and that defendant has been openly living in
this county all the time, and the officers representing the
people knew of the charge and neglected to bring defend-
ant to trial for thirty-two years, you would be justified
in believing that the testimony of the absent and deceased
eye-witnesses would have been favorable to the innocence
of the defendant." This was refused.

*Mr. Arthur Brown* and *Mr. W. H. King,* for the
appellant.

*Mr. David Evans,* Assistant U. S. Attorney, for the
respondent.

MINER, J.:

The indictment in this case charges this defendant and
two others with the murder of Henry Jones on the 24th
day of April, 1858. It was found by the grand jury on
the 8th day of March, 1890, or thirty-two years after the
alleged crime had been committed. Defendant Hancock was
tried separately. The record shows that on April 24th,
1858, the deceased, Henry Jones, was living with his
mother, Hannah Jones, his brother, John Jones, and
little sister, now Ellen H. Brown, in a small dug-out at
Payson; that at this time Ellen was a child about five
years of age. It appeared from Ellen's testimony, given
at the trial, that about nine or ten o'clock, in the evening
of April 24, 1858, she was awakened by a disturbance out-
side of the dug-out, caused by the firing of guns. She
remembers seeing her two brothers, Henry, the deceased,
and John, get up, hurriedly dress themselves, take their
guns and go out on the roof through a chimney hole.
Soon after this five or six men came into the cabin and
wanted her mother to tell them something, but what they
wanted her to tell she could not remember, it was so
long ago. She does remember, however, that her mother

was begging and pleading for the lives of her boys, and that one of the men shot and killed her mother. There being no light in the room she was unable to distinguish who were present. She was a stranger there at this time and did not know the defendant Hancock. Several weeks afterwards she saw Charles Hancock, the defendant's brother, on the street and recognized him as the man that killed her mother, and on July 4th, 1858, she saw the defendant and recognized him as one of the men who were present when her mother was killed, and she was frightened at seeing him and went and told her father. It also appears that on this occasion defendant Hancock was a constable, that this was a time of Indian wars, and guards were constantly kept out to guard against surprises from the Indians, and that Hancock and others of these guards had discovered a scheme on the part of Jones and his brother to steal horses that night and escape from the settlement to meet the United States army, then not far distant, and that Jones was in fear of injury at the hands of the people at this time, which fear induced him to leave the country at this time with stolen horses; that in order to frustrate this scheme, which had been discovered, watchmen had been placed at the *corral* where the horses were kept, and at Jones' house to prevent his escape, as well as to guard against surprises from the Indians; that after Jones had escaped from the dug-out he went from place to place in that vicinity to escape pursuit, and was very much frightened, and that he was shot in the arm while eluding pursuit or in attacking an antagonist, which was alleged to be the defendant. Jones continued his efforts to escape, and early in the morning arrived at a place called Salem or Pond Town, some three or four miles from his mother's house; that the *posse,* including the defendant Hancock and many others, were in hot pursuit and caught the

deceased at this latter place, disarmed him, and took him prisoner. Hancock seemed to be in command. A guard was placed on each side of the deceased. Hancock was a little to the rear and others about and around them. In this position they started with the deceased to return to Payson. This was supposed to be three or four hours after the killing of Mrs. Jones. Thus guarded, the prisoner started towards Payson. What followed is a matter of speculation, as the witnesses all disagree. It appears, however, from the testimony of one Wilson (a witness for the prosecution whose testimony was discredited and impeached in many ways), that Hancock directed the *posse* in charge of Jones to take him to Payson. All were armed except the deceased.

While walking along in the direction of Payson and talking about stealing horses, Jones remarked that he didn't want to go with them, that they had killed his brother and he was not going with them. About this time Jones looked up and saw some other people coming towards them and remarked: "There comes some more of the d———d cusses after me." He then stopped and threw up his hands, at which time the prosecution claims that Hancock remarked to his companions: "Now slap it to him, boys." A gun cracked, and then another, and Jones fell mortally wounded, and soon afterwards died where he was shot. There was a large party present at this killing, most of whom have since died. The next day Jones' body was taken by some one other than the defendant and placed with that of his mother, without washing or changing the clothes. The supports to the roof of the dug-out were taken down and the roof lowered to cover the remains, and they were both left thus entombed. It also appears from evidence, objected to by defendant's counsel, that a long time prior to this killing Jones had been castrated by parties then unknown. The

defendant is not proved to have had any complicity in that act. Prior to and after the killing Hancock had been a person of good · moral character. Different and contradictory accounts of the killing of Mrs. Jones and her son, and of the time when the killing took place, appear from the testimony. But enough does appear to show that the killing of Mrs. Jones was a different transaction from the killing of Henry Jones, and whether Hancock was present at her death or not is left in dispute and uncertain. On the trial the defendant was convicted.

Defendant's counsel assign twelve errors as grounds for a reversal of the verdict and judgment of conviction. Among them are the following: "(3) The court erred in allowing Henry Gardner, against the objection of counsel for the defendant, to testify that Henry Jones had been castrated and had no testicles." "(7) The court erred in refusing each one of the several requests asked for the defendant, to-wit, severally, each one of the twenty-one requests appearing in the record. (8) The court erred in charging the jury as to the effect of good character. (9) The court erred in charging the jury upon the facts as to the belief to be attached to witnesses who testified to the exact language, thirty-two years after the transaction. (10) The court erred in charging the jury that time does not run in favor of murder, and in charging that no lapse of time washes out the stains that the blood shed by the murder makes, and in charging generally upon the facts of the case." "(12) The court erred in charging the jury upon the subject of justification, the defendant not having made or asked for justification, but denying the killing; and the charge on the subject of killing was an argument that the defendant was guilty."

We do not consider it necessary to review each assign-

ment separately. In the course of the trial it appeared by the testimony of Henry Gardner, under objection from the defendant's counsel, that Henry Jones had been castrated some considerable time before the alleged homicide. It nowhere appears that the defendant had any hand or complicity in this transaction, or was in any manner chargeable therewith, or that the fact in any way tends to elucidate the question involved or throws any light upon the question of the guilt or innocence of the defendant. The presumption is that this testimony was admitted for the purpose of showing malice on the part of the defendant, and that was probably the ground upon which the learned judge admitted the testimony. If this be so, the prosecution failed in any way to connect the defendant with the act of castration. This, we think, was error. The only object for its admission, if it was admissible at all, would be to show that the defendant committed the act or assisted in its commission, and that he must have had malice against the deceased at that time; and when the prosecution failed to connect the defendant with the act, the testimony becomes wholly incompetent. Its admission under the circumstances would naturally tend to awaken a prejudice in the minds of the jury against the defendant. Testimony of this transaction was foreign to the issue and should not have been allowed.

Error is assigned upon the refusal of the court to instruct the jury as follows: "(16) In a criminal trial evidence of the good character of a person is of value, not only in doubtful cases but also when the testimony tends very strongly to establish the guilt of the accused. It will of itself sometimes create a doubt, where without it none would exist. (17) There is no case in which the jury may not, in the exercise of a sound judgment,

give a person the benefit of a previous good character. No matter how conclusive the other testimony may appear to be, the character of the accused may be such as to create a doubt in the minds of the jury and lead them to believe, in view of the probabilities, that a person of high character would not be guilty of the offense charged, that the other evidence in the case is false or the witnesses mistaken." The court refused these requests, but instructed the jury as follows: "Proof of the good character of the person charged with the offense is always allowed in this class of cases, and the weight to be given to it is to be determined by the jury. It is all important in doubtful cases. When the evidence, outside of the presumption of good character, is clear and explicit, on which no doubt can be cast, good character will only cause the jury to hesitate and think about the matter. The jury will always remember that a man has to commit his first crime. He cannot commit all the crimes, if he does commit any, at once. He has to break over the rules of good conduct and good life for the first time sometime in his life." We think the requests numbered sixteen and seventeen should have been either given to the jury or embraced in the charge of the court, and that the instruction given to the jury on the court's own motion was erroneous.

This charge, as given, limited the effect of good character to doubtful cases; and that, in cases where the evidence was clear, such evidence would only have the effect to cause the jury to hesitate and think about the matter. In other words, in clear cases of guilt, good character should have no weight, except for the jury to stop and think, but in doubtful cases it was all-important. We think the charge was misleading. In doubtful cases the jury should give the defendant the benefit of the doubt

and acquit; and to do so it would not be necessary for the defendant to add proof of good character to the doubt already existing in order to be entitled to an acquittal. It is in clear cases, therefore, where evidence of good character is of most avail. There may be cases made out so clear that no good character can make them doubtful, but there may be others in which evidence given against a person without character would amount to a conviction, in which a high character would produce a reasonable doubt, or in which high character would actually outweigh evidence which might otherwise appear conclusive. "Good character is an important fact with every man; and never more so than when he is put on trial, charged with an offense which is rendered improbable in the last degree by an uniform course of life wholly inconsistent with any such crime. There are cases where it becomes a man's sole dependence and yet may prove sufficient to outweigh evidence of the most positive character. The most clear and convincing cases are sometimes satisfactorily rebutted by it, and a life of unblemished integrity becomes a complete shield of protection against the most skillful web of suspicion and falsehood which conspirators have been able to weave. Good character may not only raise a doubt of guilt which would not otherwise exist, but it may bring conviction of innocence. In every criminal trial it is a fact which the defendant is at liberty to put in evidence and bring in, the jury have a right to give it such weight as they think it entitled to." *People* v. *Garbutt*, 17 Mich. 9; *People* v. *Mead*, 50 Mich. 233, 15 N. W. Rep. 95; *Com.* v. *Leonard*, 140 Mass. 479, 4 N. E. Rep. 96; *Cancemi* v. *People*, 16 N. Y. 501; *Harrington* v. *State*, 19 Ohio St. 264; Bishop's Crim. Proc. §§ 1115, 1116; 3 Greenleaf's Ev. § 25; *People* v. *Ash*, 44 Cal. 288; *Remsen* v. *People*, 43

N. Y. 6; *Heine* v. *Com.*, 91 Pa. St. 145; *State* v. *Daley,* 53 Vt. 442; *Coleman* v. *State*, 59 Miss. 484; Whart. Crim. Ev. § 66.

This charge also gave the jury to understand that a man was expected to commit his first offense; and the jury may have been lead to believe from it that the offense charged might be one of. those crimes that the defendant might be expected to commit for the first time, and that, as a matter of course, if the defendant had a good character and had never been connected with any crime before, he might now be expected to be guilty of this one; that the time had come at last for the defendant to break over the rule of good conduct and commit his first offense, and that. this might properly be expected from all men. We think this was error and that it was not cured by a subsequent instruction to the jury at the close of the case, wherein the court said: "Gentlemen of the jury, I may have overlooked one important matter. I do not remember now what I said to you in reference to the character of the defendant. The character of the defendant is to be considered by you in weighing all the testimony in the case. If his character, notwithstanding all the evidence in the case, raises a doubt in your minds as to his guilt or innocence —a reasonable doubt—he is to have the benefit of it." This instruction in no way modifies the erroneous instruction first given, nor does the court withdraw his first instruction from the consideration of the jury, but leaves it to stand as the law in the case, which it is presumed the court did, not intend to do. Where conflicting charges are given, one of which is erroneous, it is to be presumed that the jury may have followed that which is erroneous. *Railway Co.* v. *Monroe*, 47 Mich. 152, 10 N. W. Rep. 179; *Jones* v. *Talbot*, 4 Mo. 285; *Brown* v.

*McAllister,* 39 Cal. 577; *Aguirre* v. *Alexander,* 58 Cal. 21; *Phillips* v. *Jamison,* 51 Mich. 153, 16 N. W. Rep. 318; *Murray* v. *Com.* 79 Pa. St. 311; *Vanslyck* v. *Mills,* 34 Iowa, 375; *Railroad Co.* v. *Shuckman,* 50 Ind. 42; *Stein-meyer* v. *People,* 95 Ill. 383; *Linen Co.* v. *Hough,* 91 Ill. 63; *State* v. *Howard,* 14 Kan. 174.

The court also instructed the jury as follows: "The length of time that has elapsed since the murder that is charged was committed and the commencement of this prosecution is not to be considered at all. It is not an element to determine the guilt or innocence of this party. It is a matter not affecting his guilt or innocence one way or the other. Time does not run against the murderer or in his favor. No lapse of time washes out the stains that blood shed by the murderer makes." This charge was possibly given under a mistake of fact. We think it had a tendency to mislead the jury, and that from it they might infer what the opinion of the court was as to the identity of the murderer, the degree of the offense and the guilt of the defendant. This homicide was committed thirty-two years ago, and when we consider that the witness, Ellen Brown, was only five years of age at that time, and that other witnesses had grown old, and possibly forgetful with increasing age, we cannot conclude that the length of time that has elapsed since the homicide should not be a strong circumstance to enter into the consideration of the jury in testing the truthfulness, forgetfulness, candor, or bias of those left to relate the circumstance of this alleged murder, and as bearing upon the probabilities of the guilt or innocence of the accused. *Hopt* v. *People* 110 U. S. 574, 4 Sup. Ct. Rep. 202. For the reasons stated the verdict and the judgment of the court below should be set aside and a new trial granted.

ANDERSON, J., concurred.

ZANE, C. J., concurred only in the result, but not in the reasoning of the opinion or the reasons given for reversal.