STATE OF WEST VIRGINIA *v.* ROBERT LANE

(No. 8195)

Submitted October 23, 1935. Decided November 26, 1935.

*Salisbury, Hackney & Lopinsky,* for plaintiff in error.

*Homer A. Holt,* Attorney General, and *W. Holt Wooddell,* Assistant Attorney General, for the State.

KENNA, JUDGE:

Robert Lane was indicted for the murder of Joe Comer, was convicted of murder in the first degree, and, on the 27th day of February, 1935, was sentenced in the Intermediate Court of Kanawha County to life imprisonment pursuant to the finding of the trial jury that he be confined in the penitentiary. To the judgment of the circuit court refusing a writ of error, the defendant prosecutes this writ of error.

On the night of November 7, 1934, the defendant Lane, driving Joe Comer's automobile, and accompanied by him and by a man by the name of Oberdick, went to a barbecue stand a short distance above the City of Charleston on the north side of the Kanawha River. They left the barbecue stand shortly after midnight, and in leaving, the defendant backed Comer's car into the car of C. R. Walker, doing some damage. The testimony indicates that he may have backed into the Walker car more than once. Walker demanded to be paid for the injury to his car and threatened to call the state police. Comer, who had been drinking during the course of the evening, intervened and, according to the testimony of the state, agreed that if the parties would go to his home at South Malden he would there arrange to settle for the damage.

Lane's testimony is to the effect that the agreement was to proceed to headquarters of the state police at South Ruffner for the purpose of settling the matter.

In order to go to Comer's home from the barbecue stand, it was necessary to go west on the Midland Trail to the Kanawha City bridge, there to cross the Kanawha River from north to south, and there to turn east, going up through Kanawha City and beyond a distance of approximately two miles, to Comer's home at the place called South Malden. In going to the state police headquarters at South Ruffner, the route would have been the same until after the Kanawha River was crossed, where the turn would have been to the west instead of to the east, as in going to Comer's home.

According to the state's evidence, after the arrangement was made at the barbecue stand, Comer asked a boy by the name of John Walton to drive his car, and Walton, Lane and Oberdick started out ahead in Comer's car. Comer got into Walker's car with Charles Gardner and a girl who was with Walker, and followed his own car driven by Walton to his home at South Malden. It does not appear that either car indicated any purpose to follow a prearrangement to turn west after crossing the Kanawha City bridge, and to go to the state police headquarters. John Walton, who drove the Comer car, testifies that when they reached the Comer home, Lane demanded that he be taken to his own home slightly above Comer's, and stated that he had fifty dollars there. Walton refused to drive the Comer car further, and Lane got out, running in the direction of his own home. When the Walker car, with Comer in it, arrived at the Comer home, the whole party, with the exception of Lane, went inside, and there Wanda Comer gave Walker a check for $5.00 to pay for the damage to his automobile. This witness testifies that when Walker's car came to their home Walker brought with him two boys and a girl. During the discussion of the settlement at Comer's home, and preparing a receipt for the money that was being paid to Walker, it was desired to recite the license number of Walker's car in the writing. This he did not remember, and he started out to get it from his license plate. As he went out of the house, there was some shooting on the

outside, and he went back in again. Then Gardner and the Walton boy said they would go out and see what the shooting was about. This they tried, and, according to the testimony of Walton and Gardner, Gardner was shot when he went upon the porch. Walton states that it was Lane who shot Gardner. Walton pulled Gardner inside the house and turned the lights out, locking the door. The shooting continued, and the witness Walker states that he heard the defendant declare that he was going to kill everyone of them and they might just as well come out and take it one at a time. Other witnesses testified that they heard Lane declare that he intended to kill everybody in the house ''like rats.''

Walton testifies that after shooting Gardner, the defendant Lane came around to the back of the house, knocked out the glass in the back door and shot Joe Comer, who was standing in the dining room of the house where the lights remained on; that thereafter the defendant went further around the house, where he could see Walker telephoning, and that he there shot Walker through the shoulder, firing at him through one of the back windows of the house. C. R. Walker testified that he was shot twice, once in the hand while using the telephone in an effort to get the state police and once in the shoulder as he started toward the telephone. He testified that Lane declared that he was going to kill everyone in the house ''like rats'' and that they had as well come out one at a time and face it; that Comer started out of the back bedroom to see Lane and as he opened the door into the front bedroom, he was shot. Walker further stated that when he got through the window to run to his car, Lane was on the front porch and shot at him again four or five times. The witness stated that soon after Comer had been shot and Lane had shot the witness, Lane came outside and shot all of the tires on witness' car, shot out the headlights and with a club, broke the windshield and doors. This witness testified that when the state police came, along with a city policeman, that Lane shot at the city policeman and at the witness, and during the shooting Lane declared that he had plenty of shells. This witness states that Lane was drunk.

Arch Brown, Charleston city policeman, states that as he

went into the back of the house, the defendant ran out and shot at him. Brown returned the fire, and states that after the defendant was arrested, he observed blood coming out of the toe of one of his shoes. He states that the defendant was not nervous and did not act like he was drunk at the time of his arrest.

There is evidence on behalf of the state to the effect that after Lane had shot Gardner, Walker and Comer, he threatened other persons in the house and fired into a bed under which one or more of them had taken refuge.

Defendant's evidence is simply a broad and detailed denial of the state's whole case. He asserts that his entire conduct was due to the fact that he "figured foul play" based upon the conduct of Walker at the barbecue stand, and the fact that he demanded $20.00 damage for a dent in his fender. He says that when he got out of the car at the Comer home, he ran to his own house and got his rifle and some extra shells, because he "figured" that they were trying to "frame" Joe Comer. He went to the front bedroom window of the Comer home, heard voices but saw no one; that he there shot into the ground to "get them away," and afterwards shot through the window. He states that he heard three reports of a 32 or 38, and, still fearing "foul play," he went back to where Walker's car was parked. Seeing someone on Comer's porch, who at once disappeared, he more than ever suspected "foul play" and, therefore, shot out the windshield and tires of Walker's car so that "they" could not get away. He says that he then went to the back of Comer's house and asked Comer to let him in, and that Comer was on the bed and replied that he could not do so. Defendant states that he then broke out the glass in the back door in order to get in and protect Comer. The defendant expressly denies having shot Comer, does not state that he was drunk, and tells a disconnected story of the whole matter.

The wife and mother of the defendant testified that between one and three A. M., they heard three big shots and four or five small shots, as though from a small rifle. The defendant established a good reputation as a peaceable, law-

abiding citizen. Admittedly, there had never been trouble between him and Comer.

The first error assigned is the refusal to permit Earl Jenkins to testify that immediately after the shooting the defendant came to his home nearby and there stated to him, in substance and effect, that the defendant and Joe Comer had both been shot, and that they were trying to rob Joe Comer. It is claimed that this statement should have been admitted as a part of the *res gestae,* and that both the witness Jenkins and the defendant should have been allowed to testify concerning it. The testimony of both on this question was rejected. It does not clearly appear how long after the shooting of Comer it was before defendant was supposed to have made the statement to Jenkins. There is no theory that can be drawn from the testimony, however, under which it would not have been made an appreciable length of time after the shooting of Comer. The intervening time, it would appear, could not have been less than twenty minutes, and might have been as much as an hour. In either event, a sufficient time, under all of the circumstances of the case, had elapsed to remove the statement in question from that degree of spontaneity which satisfies the requirements of oath, confrontation and cross-examination. No hard and fast rule can be laid down governing the admission of statements as a part of the *res gestae. Ambrose* v. *Young,* 100 W. Va. 452, 458, 130 S. E. 810. The trial court is entitled to the exercise of some discretion in the matter. The statements here under consideration are self-serving in the extreme, were made after the witness had full opportunity for reflection and to concoct fabrications, had he so desired, and purported to represent the state of mind of defendant that arose from the shooting of Joe Comer, and not a state of mind that existed prior to that time. Under all of the circumstances, we can not conclude that the trial court was in error in rejecting this testimony.

The next assignment is based upon the refusal of the trial court to permit the defendant to show by witnesses that he had, before going to the barbecue stand and at about nine-thirty in the evening, attempted to get Comer to permit the

defendant to take him home for the reason that Comer was drunk. Here, again, we are of the opinion that the trial court is entitled to some discretion in deciding the relevance of testimony of this nature, and we do not believe that in this instance that discretion has been abused.

The next assignment of error relates to an illustration used by the prosecuting attorney in arguing the case to the jury. It appears that by way of illustration of the predicament of people in the Comer home while the shooting was going on, he likened their predicament to that of a trap full of rats that he, upon one occasion, had seen killed. In view of the state's contention as to the conduct of the defendant, the state's proof of the defendant's declaration that he intended to kill the persons in the Comer home ''like rats,'' and of the testimony to the effect that the defendant challenged those in the Comer home to come out and be shot down one by one, we cannot conclude that the illustration used by the prosecuting attorney exceeded the bounds of legitimate argument to the degree of constituting reversible error.

We are of the opinion that the next assignment of error, based upon the comment of the prosecuting attorney as to other offenses of which the defendant could be found guilty in connection with his conduct at the Comer home, and based upon the testimony of the state, falls within the same category, and does not constitute reversible error.

The next assignment of error is based upon the refusal of the trial court to give defendant's instruction No. 1, which reads as follows:

''The court instructs the jury that an innocent man may, through malice or otherwise, be charged with crime, and his life or liberty be endangered by fallacious circumstances or perjury, and he may be able to produce no evidence to prove his innocence, except his own oath, and if in such case a blameless life and an unstained character are of no avail—and only a mere makeweight—his condition is a sad one. The jury are therefore instructed that evidence of good character is a substantial fact, like any other, tending to establish the innocence of the defendant, and if the jury believe that the evidence of good character of the defendant as proven in this case is

sufficient to raise a reasonable doubt as to his guilt, when considered along with all the other evidence in the case, then they shall acquit him.''

If this instruction, as offered, had been confined to its concluding sentence, it may well be that its refusal would have constituted reversible error, because it correctly propounds the law concerning the value to be attached to evidence of good reputation on the part of the accused in a criminal trial. The vice of the instruction consists in the overemphasis given to the evidence of good reputation by the instruction's argumentative first sentence. The references to malice, fallacious circumstances and perjury, we think, in this case, form an entirely unjustified background for the correctly propounded legal proposition embraced in the second sentence. For this reason, and because of the unjustified abstraction contained in the instruction, we are of the opinion that its refusal does not constitute reversible error.

The second instruction for the defense ignores the fact that evidence of good reputation is to be considered by the jury along with all of the other evidence in the case in reaching their conclusion, and cannot alone be accepted by the jury as disproving the charge by discrediting the witnesses upon whose testimony it rests, nor does it alone constitute a sufficient basis for raising a reasonable doubt in the minds of the jury. For this reason, we believe this instruction was correctly refused.

A third instruction offered by the defendant, which was refused, is open to the same objection as is the second. The reference to *State* v. *Moyer*, 58 W. Va. 146, 152, 52 S. E. 30, 6 Ann. Cas. 344, relied upon in the brief to justify the language contained in this instruction and that of defendant's instruction 1, in our opinion, falls far short of its purpose. The language of the instruction seems to be taken in part from the discussion of Justice Cooley in *People* v. *Garbutt*, 17 Mich. 9, 97 Am. Dec. 162, and in part from the language of the opinion in *Hanney* v. *Commonwealth*, 116 Pa. 322, 9 Atl. 339. While we do not question the soundness of the discussions contained in the cases referred to, except to the extent that they speak of evidence of good reputation as being alone sufficient to justify an acquittal, we cannot approve of embracing the

language of an abstract discussion, such as found in the text-books and in the opinions of the courts, in an instruction, which should simply state clearly a proposition of law raised by substantial testimony in the case and should be neither argumentative nor abstract. While it is true that concrete cases may be imagined in which the proof of the state might be of such nature that evidence of the defendant's good reputation would be sufficient to raise a reasonable doubt and thus justify acquittal, we can conceive of no case where it would not be necessary, in instructions of this kind, to tell a jury that such a conclusion could be reached only by considering all of the evidence, including that of the accused's good reputation. The vice of defendant's instruction No. 3, we believe, lies in the fact that it would likely create upon the minds of the jury the impression that evidence of good reputation alone would justify them in reaching a verdict of acquittal. This, we believe, is not the law.

Assignments of error are also based upon the refusal of the trial court to give the defendant's instructions Nos. 13, 19, 20 and 21. Although there is difference in phraseology, and possibly some abstraction embraced in instructions refused have been omitted from instructions given, we are of the opinion, upon a careful examination of all of the instructions, refused as well as given on behalf of the defendant, that the substance of the instructions refused is to be found fairly covered and stated in instructions given. It would involve great tedium to explain fully here why we regard the instructions refused as having been substantially covered by one or more of the ten instructions given on behalf of the defendant. We think it is sufficient to say that all of the instructions have been minutely examined and analyzed, and that, while it may be true that the instructions refused in fact do contain some abstract statements of law that are not embraced in instructions given, nevertheless, the instructions given do cover fairly and substantially all of the law of the case applicable that is contained in the instructions refused.

For the foregoing reasons, we are of the opinion that the judgments of the Circuit Court of Kanawha County and of the Intermediate Court of that county must be affirmed.

*Affirmed.*