# MASTERS *v.* UNITED STATES.

Jury; Trial by; Directed Verdict; Criminal Law; Intent; Embezzlement; Evidence; Character; Financial Standing; Custom.

1. In view of the constitutional guaranty of the right of persons charged with crime to trial by jury, it is beyond the power of a court, either directly or indirectly, to instruct a jury to return a verdict of guilty in a criminal case.

2. A direction of a verdict of guilty, in violation of the constitutional guaranty of the right of persons charged with crime to trial by jury, is

contained in a charge that the evidence against the accused is prac-
tically undisputed, and that the law is such that, in such a case, the
jury should render a verdict of guilty, although it is prefaced with
the statement that the court cannot order a verdict in a criminal
case, and that the jury must itself return the verdict, taking the law
from the court.

3. Where an act is by statute made a crime, the statute is to be construed
in the light of the common law, and the existence of a criminal in-
tent is essential.

4. While it is undoubtedly within the power of the legislature to declare
an act criminal, irrespective of the intent with which it is done, a
statute will not be construed to have that effect, unless it clearly
appears that such is the legislative intent.

5. Where the lawmakers have incorporated into a penal statute words de-
scriptive of the crime which imply the necessity of "a mind at fault
before there can be a crime," criminal intent becomes an essential
fact in establishing the guilt of a person accused of its violation.

6. Intent is an essential element of the crime of embezzlement under sec.
834, Code D. C. (31 Stat. at L. 1325, chap. 854), making guilty of
that offense every officer or agent of a corporation who "wrongfully"
converts to his own use anything of value coming into his possession
by virtue of his employment, since intent is implied in the word
"wrongfully." (Distinguishing *O'Brien* v. *United States,* 27 App.
D. C. 263; and *Patterson* v. *United States,* 39 App. D. C. 84.)

7. The question of intent in a prosecution for embezzlement (sec. 834, Code
D. C.) is for the jury, whether the subject of direct proof, or to
be inferred from the circumstances of the case.

8. Evidence of good character of the accused is admissible in a criminal
trial on the question of intent.

9. Evidence of good financial standing of one on trial for embezzlement is
not admissible on the question of intent.

10. Evidence of a custom among trustees to handle trust funds as the
accused used funds in his hands is not admissible on the question of
intent of a corporate officer on trial for embezzlement.

No. 2657.   Submitted May 12, 1914.   Decided May 26, 1914.

HEARING on an appeal by the defendants from a judgment of
the Supreme Court of the District of Columbia convicting them
of embezzlement.                                    *Reversed.*

The Court in the opinion stated the facts as follows:

Appellants, Samuel J. Masters and John B. Kinnear,. defendants below, were convicted of the crime of embezzlement under sec. 834 of the District Code [31 Stat. at L. 1325, chap. 854], which provides, so far as material to this case, if "any officer, attorney, agent, clerk, or servant of any association or incorporated company, shall wrongfully convert to his own use * * * anything of value which shall come into his possession or under his care by virtue of his employment or office, whether the thing so converted be the property of his master or employer or that of any other person, copartnership, association, or incorporation, he shall be deemed guilty of embezzlement."

The indictment is in fifteen counts. Count one, which sufficiently raises the question here involved, charges defendants, as officers and agents of a corporation known as the Modern Workmen of the World, with wrongfully converting to their own use $600 of the funds of said corporation, which had come into their possession and care as such officers. It is not important that the proof showed $500, instead of $600, as charged.

The evidence disclosed that one McEuen sought a loan of $2,500 on real estate through one Lamson. The loan was made. A check of the Modern Workmen for $2,500 was made by defendants to Lamson, who, in turn, gave his own check for $500 to defendants as their commission for negotiating the loan. The loan was reported to the Workmen board and approved. There is no conflict as to the facts. The details of the transaction, as proven, are admitted by defendants. It is also conceded that the Workmen Corporation received ample security for the $2,500 paid to Lamson, and therefore lost nothing by the transaction, except the $500 paid defendants, its officers, for negotiating the loan.

The chief complaint relates to the charge of the court. After charging the jury that the mere acceptance of the commission was a wrongful conversion as a matter of law, the court said: "Ordinarily, I tell a jury that they must find beyond a rea-

sonable doubt; but here the evidence is practically beyond any dispute. Almost all of it, the facts as to almost all of these matters are stated by the defendants themselves in substantially the same way as stated by the other witnesses, and the counsel have not cared to argue the question as to whether the facts I have referred to are established beyond a reasonable doubt, in view of the law as held by the court. So that you will probably have no difficulty upon that branch of the case. I cannot, in a criminal case, order a verdict. In a civil case, the court may direct a verdict, but in all criminal cases the jury are bound to return the verdict themselves, but are called upon to take the law from the court, because in that way the rights of the parties can be preserved. So, my instruction is that the law is such, upon the undisputed evidence in the case, that you ought to render a verdict of 'guilty' upon the counts I have submitted to you, and of 'not guilty' upon the other counts."

*Mr. Wilton J. Lambert, Mr. J. K. M. Norton, Mr. Daniel W. Baker,* and *Mr. R. H. Yeatman* for the appellants.

*Mr. Clarence R. Wilson,* United States Attorney for the District of Columbia; and *Mr. S. McComas Hawken* and *Mr. Bolitha J. Laws,* Assistants, for the United States.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

Of course, it is beyond the power of a court to instruct a jury to return a verdict of guilty in a criminal case, either directly or indirectly by the use of language which amounts to the direction of a verdict. The Constitution of the United States guarantees every person charged with crime the right of trial by jury. Art. III. sec. 2, cl. 3, 6th Amendment. This right cannot be taken away by the legislative department of the government, much less by the judicial. It would be a judicial frittering away of the citizens' constitutional rights to hold that the charge of the court in this case did not amount to a direction to return a verdict of guilty. Juries are composed of

men of average intelligence, who have to depend upon the court
for guidance in the performance of their duties.   Every word
that falls from the lips of the trial judge is accepted, and under
all ordinary circumstances acted upon, by the jury.   In this
instance, what the court did amounted to taking from the jury
all questions of fact, and charging them that, under the law, it
was their duty to find the defendants guilty.   In *Breese* v. *Unit-
ed States,* 48 C. C. A. 36, 108 Fed. 804, a case very similar to
the one at bar, the trial judge, after expressing the opinion in
the charge that the defendant was guilty, and that it was the
duty of the jury to so find, charged the jury at great length
that his opinion was not theirs, and that they were the sole
judges of the facts, and should determine the guilt or innocence
of the defendant independently of any opinion expressed by
him.   The court of appeals, reversing the case, said:   "But,
inasmuch as the strong opinion expressed by the judge below in
his charge to the jury, in which he used the words, 'that, in his
opinion, it was the duty of the jury to convict the defendant,'
was calculated to mislead the jury, who perhaps construed this
language as a direction on the part of the court, we think it
would be proper to grant a new trial."

The instruction in the present case constitutes reversible
error.   It is not a case of the court summing up an issue of
fact, and charging the jury that if they find certain facts to
be true, they should find the accused guilty; and then summing
up the facts upon the other side, and charging that, if they
should find those facts to be true, they should acquit the ac-
cused.   No question of fact was here submitted to the jury.
The court stated that no issue of fact existed, and, applying
the law to the facts thus found by the court to be established,
declared that the defendants were guilty, and instructed the
jury that it ought so to find.   Indeed, the instruction was so
explicit that the jury would have been justified in regarding it
as a direct violation of the mandate of the court had it re-
turned a verdict of not guilty.   The trial judge "should take
care to separate the law from the facts, and to leave the latter
in unequivocal terms to the judgment of the jury as their true

and peculiar province. * * * It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Starr* v. *United States,* 153 U. S. 614, 625, 626, 38 L. ed. 841, 845, 846, 14 Sup. Ct. Rep. 919.

The court fell into this error in interpreting the statute to mean that the mere conversion of the funds constituted a wrongful conversion, and therefore the question of criminal intent was not an element of the crime to be proven, as in a common-law felony. While there are undoubtedly crimes where intent is not an essential element in establishing the commission of the offense, the general rule in this country and England is that where an act is made a crime by statute, the statute is to be construed in the light of the common law, and the existence of criminal intent is essential. *Gordon* v. *State,* 52 Ala. 308, 23 Am. Rep. 575; *Stern* v. *State,* 53 Ga. 229, 21 Am. Rep. 266; *Mulreed* v. *State,* 107 Ind. 62, 7 N. E. 884; *People* v. *Welch,* 71 Mich. 548, 1 L.R.A. 385, 39 N. W. 747; *State* v. *Snyder,* 44 Mo. App. 429; *State* v. *Presnell,* 34 N. C. (12 Ired. L.) 103; *Duncan* v. *State,* 7 Humph. 148; *Reg.* v. *Tolson,* L. R. 23 Q. B. Div. 168, 58 L. J. Mag. Cas. N. S. 97, 60 L. T. N. S. 899, 37 Week. Rep. 716, 16 Cox, C. C. 629, 54 J. P. 4, 8 Eng. Rul. Cas. 16, 8 Am. Crim. Rep. 59.

Undoubtedly it is within the power of the legislature to declare an act criminal, irrespective of the intent of the doer of the act. But to admit of such a judicial construction, it must clearly appear that such was the legislative intent. As was said in *Reg.* v. *Tolson, supra:* "Although prima facie and as a general rule there must be a mind at fault before there can be a crime, it is not an inflexible rule, and a statute may relate to such a subject-matter and may be so framed as to make an act criminal whether there has been any intention to break the law or otherwise to do a wrong or not. * * * Whether an enactment is to be construed in this sense, or with the qualification ordinarily imported into the construction of

criminal statutes, that there must be a guilty mind, must, I think, depend upon the subject-matter of the enactment, and the various circumstances that may make one construction or the other reasonable or unreasonable."

Applying this rule to the present statute, we think that where the lawmakers have incorporated into the act a word or words descriptive of the crime which imply the necessity of "a mind at fault before there can be a crime," criminal intent becomes an essential fact in establishing the guilt of a person accused of its violation. The crime here does not consist in mere conversion, but in wrongful conversion. The word "wrongful" in its legal signification must be defined from a criminal standpoint, since it is here used in a penal statute to define a crime. That the word has a well-defined meaning when used in criminal statutes is supported by Webster, who defines it as doing a thing "in a wrong manner; unjustly; in a manner contrary to moral lay or justice." The word "wrongful," like the words "wilful," "malicious," "fraudulent," etc., when used in criminal statutes, implies a perverted evil mind in the doer of the act. The word "wrongful" implies the opposite of right, a perverted evil mind in the doer of the act. In *Howard County* v. *Armstrong,* 91 Ind. 528, 536, the court defined it as follows: "Webster defines *wrongfully* as meaning: 'In a wrong manner; unjustly; in a manner contrary to the moral law or to justice.' *Unlawfully* is not the full equivalent of *wrongfully.* A thing may be *unlawfully* without being contrary to good morals or to natural justice. *Wrong* is the opposite to *right,* whether considered with reference to strict law or the principles of equity. The word 'wrongful,' therefore, has a much broader and stronger meaning than the word 'unlawful.' "

To eliminate from the "wrongful conversion" the element of criminal intent would mean to reduce the offense to a mere tort. Before there can be a conversion of the property of another, there must be an intent on the part of the doer of the act to convert the property to his own use without the consent of the owner. *State* v. *Silva,* 130 Mo. 440, 463, 32 S. W. 1007. But a wrongful conversion implies a conversion by the doer of

the act without color of right, and with the evil intent of converting the property to his own use. The intent to wrongfully convert the property of another implies more than the intent to merely convert. It implies a mind at fault, an evil mind capable of intentionally committing the offense here defined by the statute. This intent may be proved directly; or it may be inferred from the circumstances of the case as disclosed by the evidence; or it may be inferred from the nature of the conversion itself; but in all cases the inference must be deduced by the jury, and not by the court.

It was error, therefore, for the court to refuse to permit counsel for defendants to argue the question of criminal intent to the jury, and thereby withdraw from the consideration of the jury the evidence offered to establish the good reputation of defendants for honesty and integrity. Such evidence is always admissible in a criminal trial upon the question of intent. Mr. Justice Cooley in *People* v. *Garbutt,* 17 Mich. 9, 97 Am. Dec. 162, said: "Good character is an important fact with every man; but never more so than when he is put on trial charged with an offense which is rendered improbable in the last degree by a uniform course of life wholly inconsistent with any such crime. There are cases where it becomes a man's sole dependence, and yet may prove sufficient to outweigh evidence of the most positive character." On the other hand, evidence of the financial standing of the defendants is incompetent, since a rich man is as likely to violate the law as a poor man. So, also, is evidence incompetent tending to show that a custom prevails among trustees of handling the funds of estates as defendants handled the funds of the Workmen Corporation in this instance.

We find no difficulty whatever in distinguishing the cases of *O'Brien* v. *United States,* 27 App. D. C. 263, and *Patterson* v. *United States,* 39 App. D. C. 84. The question involved in *O'Brien's Case* is stated by the court as follows: "The appellant insists that the court below erred in refusing to instruct the jury that to convict the appellant it must find that Hume's money was wrongfully converted by the defendant to his own use 'with the intent to defraud Hume;' and that the court erred

in instructing the jury that to convict the appellant it must believe, respecting Hume's money in his possession, 'that he wrongfully converted that money to his own use.' We agree that the evil intent is an element of every crime, which must be in some way alleged and proved." And the court further said on the question of intent that "to wrongfully convert such money is an act in its nature evil, and the statement of the act itself imports the evil intent. The wrongful conversion constitutes the offense." But it will be observed that in this case, while the court not only held that evil intent was an essential element to the commission of the offense, and that the wrongful conversion of the property is an act in its nature evil, it was clearly held that the conversion must be proved to have been wrongful, and to establish such fact criminal intent becomes essential.

In *Patterson's Case,* the only exception involved a sentence in the charge of the court as follows: "The question of intent to defraud is not a material element, and the government is not required to prove an intent to defraud at the time of a wrongful conversion of the money, if such there was." The court on this point said: "As the word 'fraudulently' is not made an element of this offense, it was held in *O'Brien's Case, supra,* that it was not necessary to allege in the indictment that the conversion was with intent to defraud." These cases make a clear distinction between a fraudulent conversion and a wrongful conversion. But in neither case is the element of intent eliminated from the crime of wrongful conversion.

The judgment of the court below is reversed, and the cause remanded with instructions to grant a new trial.

                              *Reversed* and *remanded.*


Mr. Chief Justice SHEPARD dissenting:

I am unable to concur in the opinion and judgment in this case.

The appellants, joining with three other persons, incorporated the Modern Workmen of the World in the State of Virginia,

and established its office in the city of Washington prior to the year 1908. The corporation is a beneficial association and its certificate holders are chiefly colored people throughout the Union.

Its purposes are those expressed in the articles of incorporation:

"The purposes of said corporation being that of a beneficial association without reference to religion, creed, faith, or politics, to congregate upright persons and local or subordinate assemblies, to promote their interests and well-being by encouraging temperance in habit and uprightness and justice in practice, by ministering to the wants of families, widows, orphans, or other kindred dependents of deceased members, and by assisting such as may be sick or disabled, from the proceeds of dues, premiums, and assessments upon the members of the society, and to that end to issue beneficial certificates payable at such times, for such amounts and in such manner as shall be provided in the certificates of membership, constitution, laws, rules, and regulations of the society."

It is apparently engaged in issuing certificates insuring holders certain sick and accident benefits and payments to beneficiaries in case of death.

The management of the affairs has been in the control of the five original incorporators and their successors. Masters is the "master workman," and Kinnear chief scribe. They were both salaried officers, Kinnear receiving $200 per month; the amount of Masters' salary does not appear. They were the principal persons looking after the affairs of the association. They occupied the office of the association. Kinnear looked after the moneys received upon policies, and adjusted the sick and accident claims; Masters adjusted the death claims. Both looked after the taking in of members and the issuing of policies to them. The chief banker, who was treasurer, did not stay in the office, but carried on a private business in another part of the city. For convenience he signed blank checks and left them with Masters and Kinnear, who filled them out and issued them to parties entitled.

The association had accumulated a surplus fund, and by resolution of the board, passed in March, 1908, Masters and Kinnear were authorized to make loans of the same. When ·a loan had been negotiated, they reported the same to the board with the securities, which approved the same. The indictment in fifteen counts charged them with embezzling certain sums of money of the association in their care as such officers. Without reciting the several counts, it is sufficient to say that they charge conversions of the money in two kinds of transactions.

In those of the first kind the charge is that they reported loans made to certain persons in certain amounts, accompanied by the notes of such borrowers for the amount lent. Checks for said sums were issued in the names of said borrowers and delivered by Masters and Kinnear.

These loans were made with the understanding between the borrowers and Masters and Kinnear that the borrowers should, out of said loans, pay the latter certain sums as commissions for securing the loans.

In one instance the borrower wanted $2,000 and made his note for $2,500. When the check for $2,500 was delivered he paid them $500 of the amount. In other instances parties wanting $4,000 made their notes to the association for $2,200 each, and out of the same paid Masters and Kinnear $400. In another instance the chief banker and treasurer wanted to dispose of a note for $2,500 and offered Masters and Kinnear to take $1,500 for the same. They negotiated the transfer of the note to the association for $2,500, and out of the check for the same received $1,000 from the party. Transactions of the second kind are illustrated by the charge and proof under one of the counts.

One Lawson, who had negotiated several loans from the association through Masters and Kinnear, was the owner of a corporation organized under the laws of Idaho, called the United States Banking and Investment Company. Masters and Kinnear wishing to borrow $6,800, Lamson, at their request, executed the note of said company for said sum accompanied with collateral. The securities were approved by the board and the

loan made. Masters and Kinnear considered this loan as made to themselves, though there is no evidence that the other members of the board were informed of this.

The reason given for putting the loan in Lamson's name was that "the insurance commissioner of Virginia was always picking at everything, and had been fighting them from the day they were organized, and there was nothing that could be done right from his standpoint. He had complained of loans appearing in the names of officers, so that they put this loan in the name of Lampson with securities that were sufficient for it."

The insurance commissioner of Virginia had objected to the Sudwarth note and other loans to and transactions with directors, and for the Sudwarth note they had substituted a note signed by one of his employees.

The foregoing statement is from the testimony of Kinnear and Masters given on their own behalf.

Defendants were found guilty on counts 1, 4, 5, 6, 9, 12, and 15, which embraced transactions stated above and some others of like nature.

The jury were instructed to return a verdict of not guilty in counts 2, 3, 7, 8, 10, 11, 13, and 14.

Fines were imposed under counts 1, 9, and 12, and as to the remaining counts the case was continued for sentence.

A number of witnesses testified to the good character of defendants for honesty and integrity.

Exceptions were taken by defendants to the exclusion of evidence offered by them on the following points: (1) That it was the practice of trust companies in Washington to take commissions for their own benefit from borrowers of trust funds. (2) To the financial responsibility of defendants, and their solvency. (3) That defendants believed that the commissions received by them were not the property of the corporation, but honestly belonged to them. (4) That they in good faith believed that they were entitled to receive said commissions for their services in making the loans. (5) That there had been no losses by the corporation on the several transactions.

Exceptions were taken also to the refusal of instructions

prayed by defendants. These were: (1) To return a verdict for defendants. (2) That before either could be found guilty, the jury must believe beyond a reasonable doubt that they converted the money with a wrong or a bad intent, and not under an honest belief that they had a right to do so. (3) Substantially the same as instruction (2). (4) That to "wrongfully convert" anything of value as contemplated by the statute means to knowingly convert with an evil or wrongful intent. (5) That the burden is on the government to prove, first, that money of the corporation was taken with the intention of depriving the company of it by adverse holding or use; second, that the taking was with the intent to steal or embezzle it and deprive the company of it. (6) That the defendants cannot be found guilty if they made loans in good faith after submission to, and approval by, the directors; nor because they may have received commissions from the borrower on some of the loans made. (8) It is not a crime for directors to lend money to one of their number, unless there be fraud or bad faith, or an intention to convert the money to their own use and deprive the corporation thereof permanently. (9) Substantially the same as number (6). (10) That a corporation could not lawfully receive more than 6 per cent interest on loans, and was not lawfully entitled to charge commissions or bonuses beyond 6 per cent, as this would have been usury.

Instruction No. (7), to the effect that the burden is on the government to prove beyond a reasonable doubt that the defendants wrongfully converted the money of the corporation, was given.

The questions presented on the exceptions to the exclusion of evidence are substantially the same that arise out of the exceptions taken to the refusal of instructions, save one, which will be considered later.

As I understand it, my brethern and I are in agreement that all of this evidence was properly excluded.

A man's belief, as matter of law, that he had a right to use the funds of another for his own benefit, is no defense. Much less is the fact, if it be a fact, that the same practices are com-

mon with other fiduciaries in the District of Columbia, a defense.

If there is such a general practice, it simply shows that there are others who should be brought to the bar of justice. The solvency of defendants, which might enable the corporation to recover money or profits, is no defense. The law makes no distinction between the solvent and the insolvent.

The fact that the corporation may not have lost any of the money for which the loan notes were made is of no consequence. The charge is that the corporation was induced to pay out, as in one instance, $2,500, when the actual loan was $2,000.

The loan should have been made for $2,000, and the remaining $500 left in its treasury for other loans, instead of passing into the pockets of its agents for their services to the borrower.

The bill of exceptions then recites the following as occurring after the evidence had been closed:

"And thereupon, after all the evidence was in, the jury was sent from the room, and the judge stated what his charge would be, and concluded by saying: 'So, I feel obliged to tell the jury in accordance with the views I have just expressed, that upon the evidence as I have stated it, which I understand is the evidence on both sides, it will be their duty to find a verdict of guilty, but it can tell the jury what the law is, and it will be obliged to do so.'—'The Court: Will counsel step to the bench, in order to resolve a little doubt about this matter,'— and thereupon the judge stated to the counsel for the defendant that, in its view of the law and the undisputed evidence, there did not seem to be anything for the counsel for the defendants to argue to the jury, whereupon Mr. Lambert, of counsel for the defendants, asked if counsel for the defendants could not argue to the jury the bona fide intent of the defendants in the various transactions; the judge thereupon said that this would not be allowed to be argued, whereupon the following occurred:

"Mr. Lambert: 'In view of the position taken by the court in reference to the law, we feel that we must adopt your Honor's suggestion.'

"The Court: 'You do not care to argue the case on that line?'

"Mr. Lambert: 'No, your Honor.'

"The Court: 'The jury may be brought back.'

"Mr. Lambert: 'May it please the court, I do not want to be misunderstood. I do not mean to say that we do not care to argue, but in view of the suggestion of your Honor we do not argue.'

"The Court: 'Certainly we understand that is contrary to your view of the law.'

"Mr. Lambert: 'The way the court holds the law, I see no way to argue.'

"Mr. Norton: 'In other words, we just do not argue.'

"The Court: 'You lose nothing by that, of course.'

After this, the court refused the defendants' special instructions heretofore noted, giving the 7th as stated.

The court then proceeded to charge the jury:

"Gentlemen of the Jury, considering the views of the law indicated by the court in this case, counsel do not care to argue the questions of fact to you, for the reason that the evidence seems to be in substantial agreement; and while the counsel for the defendants do not, of course, agree with the court's view of the law, they realize they have their rights reserved by exceptions and appeal, and therefore do not care to take the time to argue any questions before you. The duty of the court is to decide what the law is and tell you, so that you may render your verdict in accordance with that law; and if the court is in error with reference to it, the higher court will review the matter, when time can be given to the question, and if error has been made, they will send the case back to be tried over again. So, I will tell you that I understand the law to be as applicable to this case; and in accordance with that law you will render your verdict.

"This indict, which is in fifteen counts, charges these defendants, in various forms, with violations of sec. 834 of the

Code of Law for the District of Columbia [31 Stat. at L. 1325, chap. 854], and I will read to you the part of it which is applicable. I will omit the words which you do not need to consider in this case.

" 'If any agent, attorney, clerk, or servant  *  *  *  of any association or incorporated company shall wrongfully convert to his own use  *  *  * anything of value which shall come into his possession or under his care by virtue of his employment or office, whether the thing so converted be the property of his master or employer or that of any other person, copartnership, association, or corporation, he shall be deemed guilty of embezzlement, and shall be punished by a fine  *  *  *  or by imprisonment,'—within the discretion of the court.

"The first count will serve as an example of the others. It charges that the defendant Masters was an officer and agent of a corporation known as the Modern Workmen of the World; that he was in the employ and service of that body as an officer, denominated and called chief workman; that the defendant Kinnear was also an officer and agent of the same corporation, as chief scribe, and that on the 11th day of May, 1909, here in the District of Columbia, the defendants Masters and Kinnear had in their possession and under their care a sum of money (stated here in this count to be $600; the evidence as to this shows that it was $500, perhaps, instead of $600, but that would make no difference in law) of the value of $600, which had come into their possession and under their care by virtue of their employment and offices in said corporation, and that, having this money in their care and possession in that capacity, they wrongfully converted the same to their own use, and thereby embezzled the same, because the Code says that that shall be embezzlement, if they wrongfully convert property in those circumstances to their own use.

"The money referred to in that count was the so-called bonus or commission which was to be paid to Masters and Kinnear for procuring what has been called the first of the Lamson loans; that is, those cases in which Mr. Lamson acted with Mr. McEuen in procuring the loan for Mr. White.

"Now, you will remember that there was such a loan, and that one of the conditions of making the loan was that $500 should be paid to Masters and Kinnear, and that it was paid. It came into their hands and possession. That is admitted; admitted by the defendants themselves; and they converted it to their own use. They admit that. That is, they applied it to their own purposes.

"With regard to that transaction, of course, the only question is whether that was a wrongful conversion, or whether it was rightful, within the mean of the statute. And that depends on whether that money, the $500, belonged to the Modern Workmen of the World. If it did, why they had no right to convert it; and what they did with it would be a wrongful conversion.

"Now, I instruct you, as matter of law, that that $500 did belong to the Modern Workmen of the World; and that being so, of course, they would be guilty with respect to that item, and that count. Being agents and trustees in the handling of that fund, they had no right to make any secret profit out of it, and anything that was given in return for the loan belonged to the association, the Modern Workmen of the World; and did not belong to the agents who were acting for it.

"This money, all the evidence shows, was in effect a part of the consideration for that loan. If it was for their services, it was for their services as agents of that corporation. If they loaned the money, they loaned it as agents of that corporation; if they recommended the loaning of it, they recommended the loaning of it as agents of that corporation, because they were in that trusted office, and they could not act for somebody else in some other capacity and make money out of the transaction. So that that money was money that belonged to the corporation, and their conversion of it was wrongful as a matter of law.

"Now, the same rule applies to each of the other transactions in which a bonus was received and appropriated by them. As I say, that rule applies to the first count of the indictment; it applies to the fourth count, which was the second of the Lamson transactions for White; it applies to the fifth count, which was the transaction in which Mr. McEuen, for Mr. White, came di-

rectly to Masters and Kinnear instead of acting through Lamson, and in which the commission so-called was $200 on the $2,200 loan. You remember.

"And the same theory applies to the $12,000 count, which refers to the transaction in which Mr. Sudwarth allowed Masters and Kinnear a bonus of a thousand dollars out of the $2,500 loan; $1,500 of the $2,500 taken from the funds of this company were paid over, loaned to Mr. Sudwarth; a thousand dollars of it went into the pockets of Masters and Kinnear, under an arrangement between them, as they have testified. That money belonged in law to the Modern Workmen of the World, and the conversion of it by the defendants was a wrongful conversion in law.

"Those are the counts and those are the various transactions disclosed by the evidence in which the defendants admit that they converted to their own use these so-called bonuses.

"The other counts which I shall submit to you refer to so-called loan transactions, in which the defendants were the real borrowers, but in which the transaction was accomplished by not appearing to be borrowers themselves, but by substituting someone as an apparent borrower, with collateral securities; and as an example of that we will take the ninth count, which refers to the $6,800 transaction.

"The evidence upon that subject on both sides is that Masters and Kinnear, desiring to use that amount of money in their own business, took it out of the funds of the Modern Workmen of the World and converted it to their own use; and, as representing the transaction, they procured from Lamson a note for that amount, with collateral securities of his, which they merely borrowed from him to be used as they saw fit; he receiving nothing whatever out of the transaction, not being, in fact, the borrower at all, and the papers being used for the purpose of concealing the real fact about the matter, so that they might not appear to be the borrowers themselves.

"The question is whether that conversion of those funds was rightful or wrongful, and on the facts it is a question of law as to whether it was rightful or wrongful. Now, they were the

trusted agents of this company, and if they loaned money they were bound to look out for the interests of the company. They would be bound to get what was lawful for the loan, and they would be bound to see that the securities were ample. As borrowers, it would be for their interest to get the loan as cheaply as possible, and with as little security as could be bargained for. The two interests were absolutely opposed to each other; that of the borrower to that of the lender. We all know that their interests are antagonistic, just as are the interests of the buyer and seller. So, just as a man cannot be a buyer and seller at the same time, neither can he be a borrower and lender at the same time of the funds which he holds in a trust capacity. But that is what they did here. They substituted these securities, which they put in here as representing a loan, which never was in fact made. If their money had gone to Lamson, his estate would have been increased by $6,800; his ability to respond and pay his account would have been so much stronger and greater. He never received a penny of it. They had the money.

"In determining whether the securities offered for this loan were ample security, they were bound to act solely for the interest of the corporation, with an eye singly for its interest. Instead of that, they were acting for themselves, with an eye to getting this money. From that point of view, the view of the borrower, no matter whether the securities were ample or not, the interests were inconsistent; and what they did was something they had no right to do.

"So that that conversion was wrongful as a matter of law. If they thought it was right, they thought wrong, and they thought differently from what the law thinks. Because the law will not suffer a trustee to be put in that position, or put himself in that position; and this section of the Code was intended to prevent trustees from dealing with funds in that wrongful way, no matter how honest they may have been about it, or how fully they may have intended that the beneficiary should suffer no harm in the future. The Code was intended to stop just that sort of dealing."

After some further discussion of the several counts submitted, the charge concluded as follows:

"Ordinarily, I tell a jury that they must find beyond a reasonable doubt; but here the evidence is practically beyond any dispute. Almost all of it, the facts as to almost all of these matters are stated by the defendants themselves in substantially the same way as stated by the other witnesses, and the counsel have not cared to argue the question as to whether the facts I have referred to are established beyond a reasonable doubt, in view of the law as held by the court. So that you will probably have no difficulty upon that branch of the case.

"I cannot, in a criminal case, order a verdict. In a civil case, the court may direct a verdict, but in all criminal cases the jury are bound to return the verdict themselves, but are called upon to take the law from the court, because in that way the rights of the parties can be preserved.

"So, my instruction is that the law is such, upon the undisputed evidence in the case, that you ought to render a verdict of 'guilty' upon the counts I have submitted to you, and of 'not guilty' upon the other counts."

Defendants then excepted to the charge as follows: (1) To so much as charged, in respect of the commission counts, that the conversion of the commissions was, as matter of law, an unlawful conversion. (2) That the said commissions or bonuses belonged to the corporation. (3) That they came into the possession of the defendants as the property of the corporation. (4) That as to those commissions defendants could not act as lenders, but must be held to be acting as agents of the corporations. (5) To the charge relating to the $6,800 transaction with Lamson, as to that being a wrongful conversion "in the shape of an alleged secret way in which it was made." (6) That as to the $2,000 and the $1,500 loans it was unimportant whether securities were sufficient or not. (7) That the defendants could not be borrowers and lenders, and represent the same parties. (8) To the reference to the $2,000 because the evi-

dence shows that loan had been paid prior to the indictment. (9) That the question of intent, or bona fide belief by defendants as to the correctness of their actions, cannot be considered. (10) That "the taking of the commissions and the handling of these notes and securities, as they did, in the counts relative thereto, was wrongful, whether or not done with bona fide intent; and that the bona fide intent was immaterial; whether they believed that they were acting honestly was immaterial." (11) That the entire charge is a violation of the defendants' constitutional right of trial by jury.

The following then occurred:

"Mr. Lambert:   *   *   *   I also desire to note an exception to the whole of your Honor's charge, or the entire charge, upon the ground that the charge is, in itself, a violation of the defendants' constitutional right, in effect, of trial by jury.

"Of course, I will renew my exceptions, if necessary to your Honor's rejection of each prayer.

"The Court:  Those have already been admitted.

"Mr. Lambert:  Yes, sir.

"The Court:  I will clear up one matter, so that there may be no misunderstanding about it.  That is with reference to directing a verdict, I cannot direct you to render any particular verdict.  I may tell you what the law is with reference to the facts as they have been disclosed here by the evidence.  I have summed up what the evidence showed, as I have understood the evidence.  If the evidence does not show that, if you do not find those to be the facts, of course you cannot render a verdict of 'guilty;' and it is all for you to say whether those are the facts or not.  Counsel have not cared to discuss the question of fact before you, in view of the law I have laid down; but, for example, as to whether these men did use this money in their own business, I have not thought it going beyond my province to say they did, because they both admitted that they did; and as to their relation with the company for instance, they admit that.

"Now, their duty is a matter of law, and that I am bound to tell you; but as to all matters of fact in the case, that is within your province. However, as I understand it, there is no dispute in the evidence as to these matters which I have outlined to you as having been shown by the evidence.

"It is for you to render the verdict, and no judge can render it for you. You may take the case.

"Mr. Lambert: I desire, may it please the court, to note an exception to the addition your Honor has given to the charge, to save my exception to the position taken as stated in the other exceptions, and also upon the ground that it does not relieve the situation of our contention that, in the prior part of your Honor's charge, there was, we submit, a practical direction of a verdict."

I cannot agree that the charge was erroneous, or that it violated the defendants' constitutional right of trial by jury.

It is the province of the court to decide questions of law, and that of the jury to decide questions of fact.

The court cannot direct a verdict in a criminal case, but it is well settled that in the United States courts he may, "whenever he thinks it will assist the jury in arriving at a just conclusion, express to them his opinion upon the questions of fact which he submits to their determination." *Simmons* v. *United States,* 142 U. S. 148, 155, 35 L. ed. 968, 971, 12 Sup. Ct. Rep. 171; *Allis* v. *United States,* 155 U. S. 117, 120, 123, 39 L. ed. 91–94, 15 Sup. Ct. Rep. 36; *Wiborg* v. *United States,* 163 U. S. 632, 656, 41 L. ed. 289, 298, 16 Sup. Ct. Rep. 1127, 1197. In the case last cited the court had said to the jury that an issue of fact was free from reasonable doubt; in all, there were disputed facts.

In each case the jury was as likely to be influenced by the judge's opinion on the facts, as in this. I agree that this recognized power of the court is a dangerous one and should be most carefully and impartially exercised. But in the case at bar there was no issue of fact, for the charges in the indictment—the acts which the court held to be wrongful as matter of law—

were undisputed. The defendants, themselves, testified to them. Their course in concluding not to argue the questions of fact to the jury, unless permitted also to argue the question of criminal intent, realized fully that unless the court was in error in excluding from the jury the question of criminal intent, there was nothing to argue; they could not ask the jury to disregard the defendants' own testimony. The court had a right to call their attention to the fact that the testimony was undisputed; that no issue had been raised upon it; and that all that was really involved was a question of law arising out of those facts. It is said in the majority opinion: "It is not a case of the court summing up an issue of fact, and charging the jury if they find certain facts to be true, they should find the accused guilty; and then summing up the facts upon the other side, and charging that if they should find those facts to be true, they should acquit the accused. No question of fact was here submitted to the jury."

In the court's view of the law, which it was his province to determine, there was no evidence to be summed up on behalf of the defendants. He had summed up correctly the evidence of the defendants themselves,—their confessions, so to speak, of the acts done, which were held to be wrongful as matter of law. There was no occasion to say anything regarding the evidence submitted by the defendants of good character for honesty. Such evidence may be of importance to the defendant where there is any conflict in the evidence, to create a reasonable doubt; but it is not a defense. Previous good character does not excuse the commission of crime.

The court could not direct the jury to return a verdict of guilty, but he did not exceed his province in saying to them it was their duty to find a verdict of guilty where the facts were given in evidence by the defendants, were undisputed in any particular, and where, as matter of law, they showed the commission of crime. The court having excluded the evidence tending to show that other fiduciaries, under similar circumstances, took part of loans made by them, for their services to the borrower, and that the defendants believed they had a legal right to do

so, and further holding that such conduct amounted to a wrongful conversion, within the meaning of the statute, there was nothing for counsel to argue to the jury. They did not except to the suggestion that they should not argue the facts to the jury; but took their exceptions on the ground of error in not submitting and permitting them to argue the question of criminal intent to the jury.

In my opinion the case turns upon the questions of law; Did the court err in holding that the conversion of the money was wrongful, and that criminal intent, or intent to defraud, was not necessary to constitute the offense?

I cannot agree that it was error to hold that the conversion of the funds constituted a wrongful conversion, and the question of criminal intent was not an element of the crime.

It must be remembered that the offense charged was not the lending of the corporation's money to its directors, or the taking of commissions from borrowers.

They confessed in one instance, for example, that they reported a loan as made to a borrower of $2,500, and the corporation, approving the loan and receiving an obligation for that amount, issued its check to the borrower for the amount.

Defendants received the check and delivered $2,000, which was the sum that the borrower had stipulated for, to him, and converted the remainder to their own use. There were several similar instances.

They were salaried officers and agents of the corporation, and it was their duty to lend its money to the best advantage. They were intrusted with $2,500 to lend. They actually lent $2,000 and converted the remainder to their own use.

That this was a conversion of the corporation's money, and a wrongful conversion, there can be no doubt.

The word "wrongful" used in the statute must be given its ordinary meaning. " 'Wrongful' means 'an invasion of right to the damage of the party who suffers it. It consists in the injury done, and not commonly in the purpose or mental or physical capacity of the person or agent doing it. It may or may not have been done with bad motives. The question of motive

is usually a question of aggravation only.'" *Mobile County* v. *Williams,* — Ala. —, 61 So. 963, 968. See also *State* v. *Hopkins,* 56 Vt. 250, 260; *State* v. *Stimson,* 24 N. J. L. 478, 481, 482; *State* v. *Voight,* 90 N. C. 741; *State* v. *McLean,* 121 N. C. 594, 599, 42 L.R.A. 721, 28 S. E. 140; *Com.* v. *Connelly,* 163 Mass. 539, 540, 40 N. E. 862.

The same doctrine is declared in two cases in this court. *O'Brien* v. *United States,* 27 App. D. C. 263, 269; *Patterson* v. *United States,* 39 App. D. C. 84, 90. As was said in *Patterson's Case.* "The principle is that where a statute prohibits an act under certain circumstances, and a person commits the act not under a mistake of fact, a criminal intent is conclusively presumed."

Everyone is bound to know that an officer or agent of another cannot lawfully profit by his agency, much less convert to his own use a fund or a part of a fund intrusted to him for a special purpose. It is clearly wrongful to do so.

In my opinion the section of the Code was intended to make this wrongful act a crime; and, as held in *O'Brien's* and *Patterson's Cases,* all that was necessary to the commission of the crime was the wrongful act. The admissions of the defendants show that they wrongfully converted this money, and thereby committed the crime of which they were convicted. They should pay the penalty. The judgment ought to be affirmed.